IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**DERON MCCOY, JR.,**

    **Plaintiff,**

    v.

**DAVID MILLER, et. al.,**

    **Defendants.**

Case No. 12-03050-JAR-KGS

## MEMORANDUM AND ORDER

Plaintiff Deron McCoy, Jr., proceeding pro se, filed this suit against Defendants David Miller, Michael Robinson, Chris Schultz, and Lee Campbell, in their individual and official capacities, for claims pursuant to 42 U.S.C. § 1983, and state law claims for false arrest and false imprisonment, seeking monetary, compensatory, and punitive damages. Only Plaintiff's Fourth Amendment claims against each Defendant in their individual capacity remain.[1] The matters before the Court are (1) Plaintiff's Motion for Summary Judgment (Doc. 128) and (2) Defendants David Miller, Chris Schultz, and Lee Campbell's Motion for Summary Judgment (Doc. 132). Both motions are fully briefed and the Court is prepared to rule. As described more fully below, the Court **grants** Defendants' motion on the basis that the officers are entitled to qualified immunity. As such, Plaintiff's motion is therefore **denied**.

## I.     Standards for Summary Judgment on Qualified Immunity

Defendants move for summary judgment on Plaintiff's Fourth Amendment claims asserted in Count I, on the basis that they are protected by qualified immunity and are thus entitled to judgment as a matter of law. Qualified immunity protects public officials performing

---

[1] *See* Doc. 82.

1

discretionary functions unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."[2] Qualified immunity leaves "ample room for mistaken judgments," protecting "all but the plainly incompetent or those who knowingly violate the law."[3]

As the Tenth Circuit explained in *Rojas v. Anderson*, "because qualified immunity is designed to protect public officials from spending inordinate time and money defending erroneous suits at trial," the qualified immunity defense triggers a modified summary judgment standard.[4] The initial burden rests on the plaintiff, rather than the defendant; and the plaintiff must first "clear two hurdles:" (1) demonstrate that the defendant violated his constitutional or statutory rights; and (2) demonstrate that the right was clearly established at the time of the alleged unlawful activity.[5] The court may decide the appropriate order to consider these issues.[6] Only if the plaintiff clears these hurdles does the burden shift back to the movant defendant to make the traditional showing that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law.[7]

In determining whether the plaintiff has demonstrated a violation of her constitutional or statutory rights and that the right was clearly established at the time, the court must view the facts and draw reasonable inferences in the light most favorable to the party opposing summary judgment. In *Scott v. Harris*, the Supreme Court held that "[T]his usually means adopting . . . the plaintiff's version of the facts," unless that version "is so utterly discredited by the record that

---

[2] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[3] *Malley v. Briggs*, 475 U.S. 335, 341 & 343 (1986).

[4] 727 F.3d 1000, 1003 (10th Cir. 2013).

[5] *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir.2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

[6] *Camreta v. Greene*, 131 S. Ct. 2020, 2031–32 (2011).

[7] *Rojas v. Anderson*, 727 F.3d 1003–04 (10th Cir. 2013).

no reasonable jury could have believed him."[8]  In *Scott*, the plaintiff's version of the facts was discredited by a videotape that completely contradicted plaintiff.  Thus, although the court should generally accept the non-movant plaintiff's version of the facts and draw reasonable inferences in the light most favorable to the plaintiff, the Court need not accept alleged facts that are contradicted or discredited by the record.  Moreover, citing to the *Scott* decision, the Tenth Circuit has held that "because at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record."[9]  In that sense, the court does not discard the Rule 56 process, but relies upon facts supported by the record, while viewing those facts and reasonable inferences therefrom, in the light most favorable to plaintiff.

Because Plaintiff proceeds pro se, some additional considerations frame the Court's analysis.  The Court must construe Plaintiff's pleadings liberally and apply a less stringent standard than that which is applicable to attorneys.[10]  However, the Court may not provide additional factual allegations "to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf."[11]  Additionally, a pro se litigant is not excused from complying with the rules of the court and is subject to the consequences of noncompliance.[12]

## II.     Factual Allegations

The Court deems uncontroverted those facts that are supported by the record to which Plaintiff either stipulates, or fails to respond or otherwise properly controvert with reference to record evidence.  Consistent with the standards discussed above, the Court accepts Plaintiff's

---

[8] 550 U.S. 372, 378–80 (2007).

[9] *Thomson v. Salt Lake City*, 584 F.3d 1304, 1312 (10th Cir. 2009) (internal quotations and citations omitted).

[10] *Whitney v. New Mexico*, 113 F.3d 1170, 1173 (10th Cir. 1997).

[11] *Id.*

[12] *Ogden v. San Juan Cnty.*, 32 F.3d 452, 455 (10th Cir. 1994) (citing *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) (insisting that pro se litigants follow procedural rules and citing various cases dismissing pro se cases for failure to comply with the rules)).

factual allegations to the extent they are properly supported by the record. Many of Plaintiff's additional facts in his response to the motion for summary judgment are not properly supported by the record, are based on inadmissible hearsay, or are conclusory statements.[13] The Court disregards those additional facts. Also, the Court does not accept factual allegations that are so utterly discredited by the record that no reasonable jury could believe them. Finally, the Court views these uncontroverted and stipulated facts in the light most favorable to Plaintiff and draws all reasonable inferences in the light most favorable to Plaintiff. The following facts are uncontroverted.

The following events took place on December 19, 2010. Defendants, all Hutchinson, Kansas police officers, were dispatched to a residence due to a report of a disturbance. It remains unclear exactly who placed the 911 call. Upon arriving at the scene, Defendants observed Laura Daniels standing outside the house. Laura reported that she is the owner of the house[14] and that Leanna Daniels (her daughter and Plaintiff's girlfriend), Plaintiff, and the minor child of Plaintiff and Leanna were inside the house. Laura explained to Defendants that (1) Plaintiff has a history of physically abusing Leanna, (2) she has personally witnessed Plaintiff hit Leanna in the past, (3) she, herself, has been hit by Plaintiff in the past, and (4) Plaintiff threatened to kill her (Laura) if she reported Plaintiff's abuse. On this particular night, Laura reported that she heard Plaintiff and Leanna arguing upstairs, that Plaintiff indicated he was not playing with her anymore, and that she heard sounds as though someone was being pushed around—specifically, Laura thought Plaintiff may have hit Leanna. Throughout all of this, Laura appeared to be visibly shaken, very upset, and concerned about what was happening inside the

---

[13] The same is true for Plaintiff's own motion for summary judgment

[14] Notably, Plaintiff admits this fact. Doc. 129 at 1.

house. Defendants observed that the doors to the house were locked, which prevented Laura from re-entering it.

Officer Campbell knocked on the door of the house, identified herself as a police officer, and asked that Plaintiff or Leanna open the door so that police could check on Leanna's well-being. At the time of the knock, Plaintiff was upstairs and, by the time he arrived at the downstairs door, Plaintiff observed Leanna talking through the *window-less* door to an officer, who indicated that she was okay. Both Leanna and Plaintiff denied Officer Campbell's request to open the door so that Leanna could be seen to verify her well-being. They also subsequently stated that entry into the house would not be permitted without a warrant. In response, Officer Campbell requested Plaintiff and Leanna come out of the house in lieu of Defendants coming in. Leanna and Plaintiff declined this compromise. As a result, and even though there was a window next to the door, Defendants were unable to see or observe Leanna throughout the entire interaction. To Defendants, it appeared Plaintiff was standing immediately next to Leanna behind the door. Concerned that Leanna was being prohibited from honestly communicating with police,[15] Defendants jointly decided they should force entry—so they did.

Plaintiff estimates that two minutes elapsed between Officer Campbell's first knock and Defendants' entry into the house through a back door.[16] Plaintiff was handcuffed and taken to another room of the house so that Defendants could interview each separately.[17] Leanna was examined for injuries, but none were found. After checking with dispatch and learning that

---

[15] Defendants provide affidavits in which they each state that, in domestic violence situations, it is not uncommon for the person being abused to make statements or take actions that protect the abuser. Doc. 133, Exs. 2 & 3. According to the Hutchison Kansas Police Department Policy, police officers responding to domestic violence calls are required to determine whether there has been an attempt to "coerce, control, punish, intimidate, or take revenge" on another person. Doc. 139 at 1.

[16] Defendants recall anywhere from five to twenty minutes between *arrival* on the scene and entry. Therefore, both Plaintiff and Defendants could be correct. Viewed in the light most favorable to Plaintiff as the nonmoving party, the Court accepts Plaintiff's two-minute estimate.

[17] This conduct is consistent with the police department's policy. Doc. 139 at 3.

Plaintiff had an outstanding warrant for his arrest on October 19, 2010 (unrelated charges), Defendants' arrested him. Defendants also arrested him on probable cause for obstruction of justice, which related to Plaintiff's refusals to let Defendants into the house or to come out of the house.[18] Plaintiff admits the officers told him both bases for his arrest.[19]

### III. Discussion

The Court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[20] Here, the Court will begin with the second prong of the qualified immunity analysis—whether the right at issue was clearly established at the time of Defendants' alleged misconduct.

To demonstrate the infringement of a clearly established right, a plaintiff must direct the court "to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits."[21] This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law, the unlawfulness must be apparent.[22] As the Tenth Circuit has explained, a qualified immunity analysis involves something of a "sliding scale": "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is

---

[18] Plaintiff was eventually charged with Obstruction of Legal Process or Official Duty but found not guilty by the municipal court judge.

[19] Doc. 137-1 at 5, ¶¶ 42, 43.

[20] *Pearson*, 555 U.S. 223 at 236.

[21] *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008); *Thomas v. Durasanti*, 607 F.3d 655, 669 (10th Cir. 2010) (holding the plaintiff bears the burden of citing what he thinks constitutes the clearly established law applicable to his claim).

[22] *Weigel v. Broad,* 544 F.3d 1143 (10th Cir. 2008) (quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)) (holding troopers violated clearly established law, as would preclude qualified immunity, where they employed unnecessary deadly force to restrain a suspect who was already handcuffed, whose legs were restrained, and who was lying prone, face down, and incapacitated).

required from prior case law to clearly establish the violation."[23] In every case, however, it remains necessary for the plaintiff to demonstrate that "every reasonable official would have understood that what he" did violated the law.[24] The question of whether a right is clearly established must be answered "in light of the specific context of the case, not as a broad general proposition."[25] The Court finds Plaintiff's has not met his burden.

Warrantless searches of a person's home are presumed to be unreasonable under the Fourth Amendment, but that presumption is not absolute.[26] To be sure, the established law as of October 19, 2010, permitted police officers to enter a residence without a warrant based on exigent circumstances.[27] For instance, "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."[28] In such a case, there is no bright line rule.[29]

Defendants argue that, because there is no bright line rule regarding exigent circumstances and thus exigency is based on the context of the situation, Plaintiff has not shown Defendants' entry and subsequent conduct violated a clearly established right. In support, Defendants cite two Tenth Circuit cases where police responded to a report alleging a domestic disturbance: *Najar* and *United States v. Davis*.[30]

---

[23] *Wilson v. City of Lafayette*, No. 11-1403, 2013 WL 518558, at *2 (10th Cir. Feb. 13, 2013) (quoting *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007)).

[24] *Id.* (quoting *Ashcroft v. al-Kidd*, —U.S.—, 131 S. Ct. 2074, 2080 (2011)).

[25] *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

[26] *United States v. Najar*, 451 F.3d 710, 713 (10th Cir. 2006).

[27] *Id.*; *see also Mincey v. Arizona*, 437 U.S. 385, 392 (1978).

[28] *Id.* (quoting *Mincey*, 437 U.S. 385 at 392); *see also Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("One [exigent circumstance] obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury.").

[29] *See id.* at 717–18 (collecting cases on exigent circumstances involving safety of officer or third party).

[30] No. 01-40036-01-RDR, 2001 WL 1013313 (D. Kan. Aug. 7, 2001) *aff'd*, 290 F.3d 1239 (10th Cir. 2002).

*Najar* and *Davis* are relevant for two reasons. First, both involve police responses to an alleged domestic disturbance. Second, the cases came to different conclusions regarding exigent circumstances with respect to the safety of a third person (as opposed to cases involving officer safety). If the Tenth Circuit is split on these factually similar, domestic-disturbance cases with respect to exigency, reasonable officers would not have understood what they did violated the law.

In *Davis*, officers responded to an alleged domestic disturbance. The Tenth Circuit recounted the facts, in pertinent part, as follows:

> Arriving first, Officer Parsons heard no noise and saw no evidence of a disturbance. The front door of the house opened. Mr. Davis appeared, clad only in a pair of boxer shorts; he had alcohol on his breath and bloodshot eyes. Standing in the doorway, Mr. Davis told the officer he had been disciplining his child and that was the reason for the noise. Officer Parsons asked for the whereabouts of Ms. Coleman and Mr. Davis replied she was in Topeka. That response notwithstanding, Ms. Coleman chose this point to appear. She wrapped her arms about Mr. Davis' waist and stated the couple had been arguing. Officer Parsons' attempt to talk to the scantily clad Ms. Coleman was impeded by Mr. Davis who tried to shield her from the officer. . . .
>
> At this point, Deputy Fletcher arrived. Officer Parsons then told Mr. Davis to step aside and stop blocking his view of Ms. Coleman who was resisting her husband's efforts to close the door. Mr. Davis refused the officers' request to enter the home, but Deputy Fletcher told him they were coming in anyway to check on Ms. Coleman. Mr. Davis responded by opening the door and ordering Ms. Coleman to go outside while he retreated into the house. . . .
>
> Officer Parsons testified Ms. Coleman tried to block him with her arm, but he pushed her away and entered.[31]

The Tenth Circuit upheld the district court's finding that exigent circumstances were not present because officers made visual and physical contact with the person allegedly in need of aid (Ms. Coleman).

---

[31] *Davis*, 290 F.3d at 1240–41.

In contrast, the *Najar* officers responded to repeated 911 calls in which the caller hung up immediately. Upon arrival, the officers repeatedly knocked and announced their presence. Eventually, Nahar opened the door and talked with the officers, denying he placed any 911 call and stating no one else was inside the home. The officers asked to come inside to verify that nobody was in need of aid. After initially refusing, Najar then permitted the officers to make sure no one else was in the home. An officer located another woman lying on the bed in a bedroom. That woman turned over her shoulder, looked the officer in the eyes, and verbally indicated she was alright. The Tenth Circuit found the entry was lawful under the exigent circumstances exception to the warrant requirement.[32] In fact, the court clarified *Davis*'s holding, stating: "Looking at the unique facts in *Davis,* we determined the officers did not face exigent circumstances because: (1) the officers had spoken with the defendant's wife, the possible victim, outside the home; (2) they knew the defendant had children; and (3) there was no history of violence."[33]

Here, the only thing Defendants knew was that a child was inside the house. Defendants knew this because Laura, Leanna's mother and owner of the house, told Defendants this upon their arrival. Unlike in *Davis*, Defendants did not speak with Plaintiff's girlfriend, the possible victim, *outside* the home, as neither Plaintiff nor Leanna presented themselves visibly to the officers before the officers came into the house through the side door, despite multiple requests to show themselves.[34] Instead, both Plaintiff and Leanna—speaking through a closed, locked, and windowless door—repeatedly insisted a warrant was required to enter their home yet refused to come outside the home as a compromise. And, while Defendants did not *personally* know

---

[32] *Najar*, 451 F.3d at 720.

[33] *Id.* at 719.

[34] Plaintiff now claims Leanna could have gone to an adjacent window, but provides no evidence in the record for this claim.

whether Plaintiff had a history of violence like the officers in *Davis* did, Defendants knew there was at least a *potential* history of violence with respect to Plaintiff because Laura explained to Defendants that (1) Plaintiff has a history of physically abusing Leanna; (2) she has personally witnessed Plaintiff hit Leanna in the past; (3) she, herself, has been hit by Plaintiff in the past; and (4) Plaintiff threatened to kill her if she reported Plaintiff's abuse. Given these differences between the circumstances in *Davis* and the circumstance here, the Court cannot find that every reasonable official would understand that entering Plaintiff's home violated the law.

Indeed, the instant case is factually distinguishable from both *Najar* and *Davis* on one important point: the officers in this case were **not** able to visually confirm the safety of the alleged victim, Leanna. While Leanna's conduct may be somewhat akin to Ms. Coleman's actions in *Davis*—insofar as she affirmatively indicated she did not want the officers to enter the premises—the important difference is that the officers could identify the condition of Ms. Coleman because she was visible to the officers; Leanna was not.[35]

Plaintiff relies heavily upon *Kentucky v. King*, which held that warrantless searches conducted after police-created exigent circumstances do not violate the Fourth Amendment so long as the police did not create the exigency by violating or threatening to violate the Fourth Amendment.[36] But *King* was decided in 2011, after Defendants' conduct in 2010.[37] It is

---

[35] Plaintiff argues that Leanna could have gone to a nearby window for the officers to inspect her. However, Plaintiff provides no evidence that such a window exists. Plaintiff and Leanna also refused the officers' compromise that rather than let the officers come inside the home, Plaintiff and Leanna come outside the home. Thus, there is little reason to believe Plaintiff or Leanna would have accepted that compromise had it been presented. Plaintiff can insist they would have, but he now has the benefit of hindsight.

[36] 563 U.S. 452, 131 S. Ct. 1849 (2011). Plaintiff cites *King* for its dicta which states: "When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak . . . And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." *Id.* at 563 U.S. 4__, 131 S. Ct. at 1862.

[37] To be clear, the Court makes no findings as to *King*'s legal application to the facts of this case.

therefore irrelevant to the clearly established prong of qualified immunity analysis. For all of these reasons, Plaintiff has not met his burden of proving the right at issue was clearly established at the time of Defendant's conduct.

As for Plaintiff's arrest, Plaintiff admits the officers told him he was being arrested for two reasons: (1) obstruction of the officers' duty (the safety check), and (2) a possible outstanding warrant on an unrelated matter. Plaintiff does not address his arrest in the context of clearly established qualified immunity analysis. Nevertheless, the Court finds Defendants' reliance on the information provided by dispatch indicating there was an outstanding warrant for Plaintiff was objectively reasonable under the circumstances.[38] Therefore, Defendants are entitled to qualified immunity as to their arrest of Plaintiff.

## IV. Conclusion

For all of the reasons above, Defendants are entitled to qualified immunity because Plaintiff has not shown the constitutional rights he alleges Defendants violated were clearly established at the time of Defendants' conduct. Plaintiff has not shown that "every reasonable official would have understood that what he" did violated the law. That goes for both Defendants' warrantless entry into Plaintiff's residence and Defendants' arrest of Plaintiff based on dispatch informing the officers that there was an outstanding warrant for Plaintiff on unrelated charges. Because the officers are entitled to qualified immunity, the Court must deny Plaintiff's

---

[38] *See Seals v. Jones*, No. 12-CV-569-JED-TLW, 2014 WL 3818280, at *10 (N.D. Okla. Aug. 4, 2014) ("Considering the circumstances and information possessed by Deputy Jones at the time of plaintiff's arrest, and in light of the Supreme Court's decisions in *Herring* and *Evans,* it is clear that Jones's reliance on the warrant was objectively reasonable. The undisputed evidence establishes that Deputy Jones relied upon the information relayed to him, which indicated that there was an outstanding bench warrant for plaintiff's arrest. While that information was inaccurate because the warrant had actually been recalled, there is *no evidence* that Jones was aware or had reason to know the information was inaccurate, and his arrest of plaintiff on the warrant was objectively reasonable under the circumstances. In other words, a well-trained officer with the information then possessed by Jones could have believed that the arrest was lawful.").

motion for summary judgment.  And because the only remaining claims are against Defendants in the individual capacities, this case is hereby dismissed with prejudice.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants David Miller, Chris Schultz, and Lee Campbell's Motion for Summary Judgment (Doc. 132) is **granted**.  The Court finds Defendants are entitled to qualified immunity.  As such, Plaintiff's Motion for Summary Judgment (Doc. 128) is therefore **denied**.

**IT IS SO ORDERED.**

Dated: September 11, 2015

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE